Justice LEE,
opinion of the Court in part:
50 I concur in the judgment of the court but write separately to identify some points of disagreement with elements of the court's analysis. For reasons explained below, I would not affirm the merits of the district court's decision annulling and setting aside the election in question under Utah Code section 20A-4-404(4)(c). See supra ¶ 25. Yet I would nonetheless affirm the decision in question in light of Utah Code section 20A-4-406(2), which "void[s]" a certificate of election in a case (like this one) where "an election is annulled or set aside by the judgment of a court and no appeal is taken within 10 days." And finally, instead of presuming knowledge of the "legislature's intent" on a subject not addressed expressly in the code, supra 141, I would employ the doctrine of absurdity to deem the relevant statute, Utah Code section 20A-1-501(1)(a), to be triggered by the statutory directive "void[ing}" the primary election certificate.
I. PLEADING AND PROOF IN AN ELECTION CONTEST
51 First, I disagree with the court's conclusion that an election contest can be sustained "even if the contested votes cannot ultimately be counted, as when ballots are lost or destroyed." Supra ¶ 33. Under the governing statutory provisions as I understand them, it is the election contest petitioner's burden to plead and prove that any "illegal votes" that were cast would have made a difference in the election. See UTax Cope § 20A-4-408@)(c); id. § 20A-4-404(8), (4). And in light of that burden, I would conclude that any uncertainty in contested ballots that "cannot ultimately be counted" should be resolved against the election contest petitioner.
T 52 That premise seems embedded in the operative terms of the code. The code lists two categories of election contest claims: (a) those in which the election contest petitioner must establish that there were errors (in fraud, corruption, illegal votes counted, legal *703 votes not counted, ete.) "sufficient to change the result" of the election [62] and (b) those that do not implicate the result of the election, as where the person declared elected was ineligible for office.[63] The implication is clear. For the former category of election contest claims (including claims asserting that "illegal votes have been received or legal votes have been rejected at the polls"), the statute contemplates a showing of an impact "sufficient to change the result" of the election. Id. § 20A-4-402(1)(d).
T53 The pleading provisions of the code reinforce this conclusion. To assert a "cause of contest" in a case in which "the reception of illegal votes" is the basis for challenging a primary election, a petitioner must "state generally that ... illegal votes were given to a person whose election is contested, which, if taken from him, would reduce the number of his legal votes below the number of legal votes given to some other person for the same office." Id. § 20A-4-403(2)(c)(i). Alternatively, where the contest involves "legal votes" that were "rejected," a petitioner must allege that "legal votes for another person were rejected, which, if counted, would raise the number of legal votes for that person above the number of legal votes cast for the person whose election is contested." Id. § 20A-4-403(2)(c)(ii). Thus, even at the pleading stage, the petitioner's burden is more than just to identify a number of votes that would be sufficient to alter the outcome of the election if all of the ballots in question were assumed to have been cast for the "other person." Instead, as to illegal votes, the election contest petitioner must allege that "illegal votes were given to a person whose election is contested" in a number that is sufficient to "reduce the number of his legal votes below the number of legal votes given to some other person for the same office." Id. § 20A-4-403(2)(c)(i). And, as to rejected legal votes, the election contest petition must allege that such votes "for another person were rejected," and that such votes "if counted, would raise the number of legal votes for that person above the number of legal votes cast for the person whose election is contested." Utar Cope § 20A-4-4033(2)(c)(ii).
{54 The election contest petitioner must accordingly do more than "challenge[] enough votes to meet or exceed the margin of victory." Supre ¶ 27. He must instead make allegations that go to the actual impact of alleged illegal votes on the outcome of the election-as to fllegal votes "given to a person whose election is contested" that would "reduce the number of his legal votes below the number of legal votes given" to the petitioning candidate, or as to rejected legal votes "for" the petitioning candidate that "would raise the number of legal votes for that person" above those cast for the person whose election is contested. Id. § 20A-4-403(2)(c).
155 To me, this makes sense as a legal and logical matter. I see no basis in law or logic to assume that all illegal ballots in question (or rejected legal ballots) would have been cast in favor of the candidate filing the election petition. And the contrary presumption (in favor of the candidate whose election is contested) is premised rather straightforwardly in the burden of proof that *704 the law has long assigned to a plaintiff or petitioner. Indeed, resolution of matters unresolved by the evidence is a core function of the burden of proof. One reason we assign a burden of persuasion is as a tie-breaker-to give the benefit of the doubt to the status quo, and to require the plaintiff or petitioner to rebut the status quo with evidence.[64] The pleading provisions of the election code appear to me to affirm this burden, by requiring an election contest petitioner to do more than just identify "enough votes to meet or exceed the margin of victory." Supra ¶ 27.
€ 56 The evidentiary standards in the code seem to me to further undermine the majority's approach. Under subsection 408(2)(d),
The court may not take or receive evidence of any of the votes described in Subsection (2)(c), unless the party contesting the election delivers to the opposite party, at least three days before the trial, a written list of the number of contested votes and by whom the contested votes were given or offered, which he intends to prove at trial.
Urax Cops § 20A-4-408@)(d)G). In addition, the same provision clarifies that "[t]he court may not take or receive any evidence of contested votes except those that are specified in that list." Id. § The focus here and elsewhere is on "evidence of contested votes," and on "prov[ing]" those votes "at trial." This runs counter to the idea of presuming that contested votes would have been cast in favor of the petitioner (and against the person whose election is contested). Clearly, the code contemplates proof of the illegal votes, and by evidence presented at trial.
157 Final confirmation of this conclusion appears in section 404. That section pre-seribes the procedures governing the court in an actual election contest proceeding under the election code. It indicates that the "court shall meet at the time and place designated to determine the contest," and, when "necessary for the court to inspect the ballots of any voting precinet in order to determine any election contest," it directs the court to "open and inspect the ballots in open court in the presence of the parties or their attorneys." Id. § 20A-4-404(2)-(8) (emphases added). Two points stand out in these provisions. One is that the court is to "determine the contest." The other is that that determination is to be made by "open[ing] and inspect[ing] the ballots in open court." This strikes me as incompatible with the majority's notion of a presumption in favor of the petitioner. Far from assuming that "eight illegal votes in a five-vote- margin election [are] enough to warrant setting aside the election results," supra ¶ 35, the code directs the court to consider the evidence before it to decide whether the illegal votes are sufficient to change the results of the election. And the code indicates the manner in which that evidence is to be considered-by inspection of the ballots in question, again to determine the proper resolution of the contest in question.
158 It is no answer, in my view, to assert that in this case "the contested votes cannot ultimately be counted." Supra ¶ 33. That proposition was adopted by the district court and endorsed by the parties in the case before us on this petition for extraordinary writ. See Mem. Decision 11-12 (concluding that the court's "choices are limited" because the court could not "determine who received the highest number of legal votes"); Mem. Resp. & Opp. to Pet. 8 (noting that "because of how the contested ballots had been handled-co-mingled with all the other absentee ballots ...-it would not be possible to identify and find those ballots to determine how they had been cast"). The premise, as far as I can tell, is that the contested ballots were comingled with other ballots, in a manner rendering it impossible for the district court to "open and inspect the ballots in open court" in the course of "determin[ing] the *705 contest." See Mem. Resp. & Opp. to Pet. 3. I have no basis for questioning that conclusion.[65] But it is in my view beside the point under the statute. Apparently, the legislature contemplated a proceeding in which a petitioner in an election contest would present contested ballots to the district court for inspection and an ultimate resolution of the contest. If for some reason that evidence was unavailable in this case, there is an established mechanism for resolving a case in which evidence is missing-the burden of proof, And because the election contest petitioner (Dyer) bore the burden, I do not see how we can affirm a decision annulling and setting aside the election on his election contest petition absent the evidence and proof contemplated by the statute.[66]
59 By statute, the district court has authority to "annul[ ] and set[ ] aside the election." Utax CopE $ 20A-4-404(d)(c)@). But that authority is to be exercised in connection with the court's determination of the election contest, and upon inspection of the contested ballots "in open court" Id. § 20¢-4-404(8)(b)(). Indeed, as if to emphasize this point, the code specifies that the district court's authority to enter a judgment "annulling and setting aside the election" is to be exercised only "[alfter all the evidence in the contest is submitted." Id. § 20A-4-404(4)(c)(i).[67] Because the district court did not determine the election contest in this case on the basis of the evidence specified by the code, and the election contest petitioner (Dyer) did not carry his burden of persuasion under the statute, I would not affirm the district court's decision on the merits. And I would not conclude that an election contest petitioner may succeed in overturning an election without carrying his burden of proof.
II. LACK OF AN APPEAL AS VOIDING A CERTIFICATE OF PRIMARY ELECTION
T 60 For the above reasons, I disagree with the grounds for the court's decision to affirm the district court's decision annulling and setting aside the election in question on its merits. Yet I would still affirm the decision of the district court on the basis of a procedural bar in the election code. On this point, moreover, a majority of the court agrees.
{61 Under Utah Code section 20A-4-406(2), "[wJhenever an election is annulled or set aside by the judgment of a court and no appeal is taken within 10 days, the certificate *706 of election, if any has been issued, is void, and the office is vacant." The conditions of this provision have been satisfied in this case. Judge Laycock entered an order annulling and setting aside the election in question on August 14, 2014. That judgment became unassailable when no appeal was taken by the parties within ten days-on or before August 24, 2014. At that point, the "certificate of election" in question became "void" by statute. I would affirm Judge Layeock's order annulling and setting aside the election in this case on that basis. And in so doing, I would stop short of reaching the pleading and proof problems discussed in Part I of this opinion above.
162 For these reasons, and for others set forth in the majority opinion of Associate Chief Justice Nehring, supra 11 36-39, I would also hold that the district court erred in ordering a special election. As Justice Nehring indicates, the election code nowhere empowers the court to order a special election. And a decision ordering government officials to conduct such an election without affording them notice and an opportunity to be heard would fail as a matter of procedural due process."[68] In any event, the impact of the lack of an appeal is clear; The "certificate of election ... is void, and the office is vacant." Urax Cop® § 20A-4-406(2). That remedy affords no room for a special election.
T63 Justice Nehring arrives at the same ultimate conclusion-affirming the decision setting aside the election but reversing the decision ordering a special election. But he rests his decision on the merits of the underlying election contest, while deeming section 406(2) inapplicable. The proffered grounds for avoiding section 406(2), however, misunderstand my basis for invoking this provision, and provide no basis for ignoring its terms.
1 64 I have no quarrel with the proposition that the lieutenant governor acted with "dili-genee" in submitting his petition for extraordinary writ. Supra ¶ 24. Thus, I am on board with the conclusion that the petition was timely (and not barred by the doctrine of laches), and agree that we should "reach the merits" of the lieutenant governor's claims. Supra ¶ 24. My point is simply that in addressing the merits, we should give effect to the governing provisions of the election code, including Utah Code section 20A-4-406(2).
T 65 I am not suggesting that this provision "insulate[(s]" the district court's decision "from review." Supra 128. Instead, I would simply hold that in exercising our extraordinary writ power, we are no less bound to follow the law. A petition for extraordinary relief invokes this court's "original jurisdiction." See Urax Const. art VIII § 3. Such a petition is simply an alternative procedural pathway for a party to ask this court to exercise its judicial power. But whether we are exercising original or appellate jurisdiction, we are always bound to follow the law. And here that law includes section 406(2).
T 66 Section 406(2) is simple and straightforward. It provides a "brief ten-day window for the parties to appeal an election decision," supra ¶ 23, and expressly indicates that the election certificate is "void" where there is no appeal, UTax CopE § 20A-4-406(2). That provision sustains significant reliance interests; and those interests ought to be protected in the exercise of our original jurisdiction. I would affirm on the basis of section 406(2), which clearly dictates affir-mance of the district court's decision.
III, THE DOCTRINE OF ABSURDITY
T 67 When a certificate of election becomes "void" under Utah Code section 20A-4-406, *707 the statute also dictates the conclusion that "the office is vacant." A vacancy in an office, in turn, is addressed by the terms of Title 20A, Chapter 1, Part 5 of the code. In the event of a "midterm vacancy" in a county office, for example, the code provides for appointment of an "interim replacement" by the "county legislative body" and the subsequent election of a "replacement" by terms and conditions specified for a special election. Uran Copz® § 204¥-1-508. This part of the code also speaks to a different sort of "vacancy"-a candidate vacancy. For a "registered political party that will have a candidate on a ballot in a primary election," the code specifies procedures for the party to replace a candidate who "dies," "resigns" due to a "disability," or "is disqualified by an election officer for improper filing or nominating procedures." Id. § 20A-1-501(1)(a). Specifically, this section of the code indicates that a "candidate vacancy" in a county office is to be filled by "the county central committee of a political party." Id. § 20A-1-501(1).
68 As the majority indicates, this provision is not technically implicated in this case. Supra " 48. By its terms, this section does not apply because this is not a case in which there is a "candidate vacancy" precipitated by death, resignation due to disability, or disqualification by an election officer for filing or nomination violations.
T 69 The question presented, accordingly, is how to deal with what appears to be a gap in the code. One possible approach, and the one that would be the ordinary course for a court, is for us to stand down-to do nothing, and treat the gap as one for the legislature (and not this court) to fill going forward. This is the ordinary course because it respects the work product of the legislature-the statutory text. In most all cases, it is not the court's job to fill in the gaps it finds in legislation. That is most always a legislative function, and thus not one for us.
170 With this in mind, I disagree with the line of cases cited approvingly in the majority opinion. See supra ¶ 42 n. 51. I would not conclude, as these courts seem to, that "when a statute is silent" on a particular issue, it is our role to fill in the gap with our best sense of the legislature's "intent" on the omitted matter. Supra ¶ 42 n. 51 (citing cases). Instead of imagining the legislature's intent in such cireumstances, in an effort to " 'determine the best rule of law to ensure that the statute is applied uniformly," supra ¶ 42 n. 51 (quoting Mariemont Corp. v. White City Water Improvement Dist., 958 P.2d 222, 226 (Utah 1998)), we should generally treat the omitted case as simply omitted from the legislation.[69]
71 Yet there is a narrow, limited exception to this rule. The exception is the doe-trine of absurdity, under which we may find the text of a statute to encompass a term or condition not expressly provided by the legislature. This is strong medicine, not to be administered lightly. To respect the separation of powers and the constitutional prerogatives of the legislature, we must not substitute our views of good policy for that of the legislature. Instead, we should deem ourselves bound to follow and implement only the terms and conditions of the code except in the rare and limited cireumstance in which the terms as written would lead to an outright absurdity.
172 The doctrine of absurdity is both deeply rooted and narrowly restricted. It traces its roots at least to Blackstone, who asserted that "where words bear ... a very absurd signification, if literally understood, we must a little deviate from the received sense of them." 1 BLACKSTONE, CommEntartss *60 (emphases added). The emphasized terms in Blackstone's formulation highlight two points of limitation. One is the degree of absurdity. If we are to *708 maintain respect for the legislature's policy-making role, and avoid the temptation to substitute our preferences for its decisions, we must not override the statutory text with our sense of good policy in a case in which we deem the statute's formulation merely unwise or incongruous. To justify this extraordinary exercise of judicial power, the text as written must be so overwhelmingly absurd that no rational legislator could ever be deemed to have supported a literal application of its text.[70]
T73 Some examples from modern cases may help to illustrate the standard. In 1995, a Texas statute provided an absolute defense to all "Chapter 601 offenses" under the Texas code where the accused "produce[d] in court a motor vehicle liability policy ... that was valid at the time the offense is alleged to have occurred." [71] Read literally, this provision would have provided not just a defense for the "Chapter 601 offense" of driving without proof of insurance, but absolute immunity (by production of proof of insurance) for other "Chapter 601 offenses" such as driving on a suspended license. In State v. Boone, 1998 WL 344931 (Tex.Ct.App. June 30, 1998) (unpublished), the court avoided this absurd result, It did so by limiting "Chapter 601 offense" to the offense of driving without proof of insurance. Id. at *2-*3. Rightly so, as no rational legislator could be deemed to have supported the statutory text as written literally.[72]
I 74 The second limitation in Blackstone's formulation is also important. It authorizes "little" or minor deviations from the statutory text to avoid absurdities in statutory meaning. As to larger deviations, the premise is that it is more likely that a judicial override of literal statutory text may represent a mere policy disagreement, and not a correction of an unintended (and obvious) disconnect between the policy adopted by the legislature and the text it used to implement it. To minimize the risk of judicial overreach, the absurdity doctrine should be limited to cases in which there is a "non-absurd reading that could be achieved by modifying the enacted text in relatively simple ways.[73] The above-cited Texas case is a good example. Because it was "relatively simple" to read a limitation on "Chapter 601 offenses," the Texas court was able to avoid an obvious absurdity in a manner consistent with the Blackstone limitations on the doctrine.
T 75 I would reach the same conclusion as the majority by application of these tenets of the doctrine of absurdity. For reasons explained by the court, it is impossible for me to imagine that any rational legislator would have supported a literal construction of the *709 election code-a construction leading to the determination that annulment of a primary election would leave a registered political party without a designated candidate in the general election. That outcome is literally absurd, and by no means the sort of outcome that any legislator could have intended as any sort of legislative compromise. That conclusion is particularly clear (as the majority notes) in light of other provisions of the code that comprehensively prescribe mechanisms for a party to designate a replacement candidate when the candidate designated in the primary is otherwise unavailable-due to death, resignation due to disability, or disqualification by an election officer for filing or nomination violations. See supra ¶¶ 44-45 (citing Utax Cope § 20A-1-501). And the point is hammered home by another provision of the code, section 20A-1-508, which, as the majority explains, allows a political party to "summarily certify" a candidate for a general election when a vacancy arises within 75 days of a primary but more than 65 days before the general election. Supra ¶ 45 n. 58 (citing Urax Cope § 20A-1-508(5)). In light of these provisions, and for reasons explained in greater detail in the majority opinion, I would conclude that no rational legislator could have intended to leave a registered political party without a candidate on the ballot in a case in which the primary election is annulled and set aside.
176 I would also endorse the majority's adoption of the mechanism set forth in, Utah Code section 20A-1-501(c)@fii) as the applicable provision in this case. That provision prescribes a procedure for a party to designate a substitute candidate where the candidate chosen in a primary has been disqualified by an election officer. That is not technically what happened here. But extension of that provision to this (closely analogous) case represents a "relatively simple" adjustment to the statutory language. And for that reason the court's adoption of this provision seems to me to be compatible with our limited authority under the narrow doctrine of absurdity as described above.

. Urawx Cope § 20A-4-402(1)(a) ("for malcon-duct, fraud, or corruption on the part of the judges of election ... sufficient to change the result"); id. § 20A-4-402(1)(d) ("when illegal votes have been received or legal votes have been rejected at the polls sufficient to change the result"); id. § 20A-4-402(1)(e) ("for any error of any board of canvassers or judges of election in counting the votes or declaring the result of the election, if the error would change the result"); id. § 20A-4-402(1)(f) ("when the election result would change because a sufficient number of ballots containing uncorrected errors or omissions have been received at the polls"); id. § 20A-4-402(1)(h) ("when an election judge or clerk was a party to malconduct, fraud, or corruption sufficient to change the result of the election"); id. § 20A-4-402(1)(i) ("for any other cause that shows that another person was legally elected").

. Id. § 20A-4-402(1)(b) ("when the person declared elected was not eligible for the office at the time of the election"); id. § 20A-4-402(1)(c) ("when the person declared elected has: (i) given or offered to any registered voter, judge, or canvasser of the election any bribe or reward in money, property, or anything of value for the purpose of influencing the election; or (ii) committed any other offense against the elective franchise"); id. § 20A-4-402(1)(g) ("when the candidate declared elected is ineligible to serve in the office to which the candidate was elected").

. See, eg., 21B Cuartes Aran Waricut & Kenneth W. Grartam, Jr., Fepgrar Practice & ProcepurE: Eve pence § 5122, at 394 (2d ed.2005) (explaining the policy underlying the burden of proof by noting that "[u)nder the American system," judges do not "roam about the countryside like the Lone Ranger seeking wrongs to right," rather a party brings a dispute to the judge and if that party were to "demand satisfaction from another, yet refuse to provide any information about the dispute," the judge will not require the information of the opposing party because "the opponent is not asking any favors of the court," the judge will "refuse[ ] to give the claimant the relief demanded where he has failed to bring evidence to support his claim").

. In the course of briefing and oral argument, the suggestion was made that the proof problem in this case was not the product of comingling of ballots but instead a systemic issue embedded in our electronic voting system. The point, specifically, was that it is technically impossible to "inspect" a contested (allegedly illegal) ballot in court to determine which way the ballot was cast on the office in question. See Oral Arg. 9:00-17:00; but see Mem. Decision 9-10 (noting that by statute for either a paper or electronic ballot "(tlhe poll worker should have written [Russell C. Jones's) ballot number and the name of the Republican party opposite Mr. Jones's name in the official register," that for a paper ballot the poll worker should have "endorsed Mr. Jones's initials on the [ballot] stub"). I have no way of knowing whether that is in fact the case. But if it is, this is a problem that the legislature, the lieutenant governor, and other election officials ought to be aware of. If there is a disconnect between the governing election contest provisions of our code and the voting system we are currently employing, one or the other of them ought to be altered. If our current voting system in fact makes it impossible to inspect a challenged ballot, our system should be altered to facilitate the required determination by the court. Or, alternatively, our election contest provisions should be amended to bring them in line with our current voting system.

. In so concluding, I would render neither judgment nor "suspicion" as to the "types of circumstantial evidence" that "could properly be relied upon to determine the outcome of an election." Supra ¶ 27 n. 32 ("express[ing] great suspicion" that voter testimony could be considered in an election contest).

. Presumably, the usual circumstance in which an election contest would be annulled and set aside without declaring another person the rightful winner would be the circumstances spelled out in the statute in which. there is no showing required as to the impact on the "result" of the election. See supra ¶ 52 n. 66; Urax Coor § 20A-4-402(1)(b), (c), (g). This case is another-more unusual-example. As explained below, the lack of an appeal from the judge's order annulling and setting aside the election in this case "void[ed]" the certificate of election by statute. Urax Cope § 204-4-406(2). Ordinarily, however, an election contest premised on an allegation of illegal votes being counted and/or legal votes not being counted would require proof that the votes in question were "sufficient to change the result." Id. § 20A-4-402(1)(d).

. Under the governing civil rule, a party to an injunction is entitled to notice and an opportunity to be heard. Ura R. Civ. P. 65A(a)(1) ("No preliminary injunction shall be issued without notice to the adverse party."); id. 65A(d) (providing that an injunction "shall be binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive notice"). That rule, moreover, is an outgrowth of the constitutional right to due process. See 11A CHaries Aran WaeicHt & Artuur Mircer, Fepgrar Practice & Proce-pure § 2956 at 383-84 (3d ed.2013) ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction. Therefore, persons who are not actual parties to the action or in privity with any parties may not be brought within the effect of a decree merely by naming them in the order." (footnote omitted)).

. See Iselin v. United States, 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566 (1926) (Brandeis, J.) (''To supply omissions transcends the judicial function."); Jones v. Smart, (1785) 99 Eng. Rep. 963 (K.B.) 967 (Buller, J.) ("[Wle are bound to take the act of parliament, as they have made it: a casus omissus can in no case be supplied by a Court of Law, for that would be to make laws...."); Frank H. Easterbrook, Statutes' Domains, 50 U. Chi L.Rev. 533, 548 (1983) ("Judicial interpolation of legislative gaps would be questionable even if judges could ascertain with certainty how the legislature would have acted. Every legislative body's power is limited by a number of checks.... The foremost of these checks is time.... The unaddressed problem is handled by a new legislature with new instructions from the voters.").

. See 1 Josgex Story, Commentaries on tks Constr Turion or tue Unitep States § 427, at 411 (1833) ("{If, in any case, the plain meaning of a provision, not contradicted by any other provision of the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one, where the absurdity and injustice of applying the provision to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application."). The Story formulation may contain a bit of hyperbole. In the divided society we live in today, I rather doubt there are any points of statutory interpretation on which "all mankind" would "unite" "without hesitation." For me, the better formulation is one that would ask whether any rational legislator could have adopted the formulation rendered by the literal text. See Hanif v. Att'y Gen., 694 F.3d 479, 483 (3d Cir.2012) (invoking the doctrine of absurdity upon a showing that "blind adherence to the literal meaning of a statute [would] lead to a patently absurd result that no rational legislature could have intended"); Cernauskas v. Fletcher, 211 Ark. 678, 201 S.W.2d 999, 1000 (1947) (refusing to read literally a provision which read "(alll laws and parts of laws, and particularly Act 311 of the Acts of 1941, are hereby repealed" because "[njo doubt the legislature meant to repeal all laws in conflict with that act, and, by error of the author or the typist, left out the usual words 'in conflict herewith,' which we will imply by necessary construction").

. Tex Transp. Cope Ann. § 601.193(a) (West 1995).

. See also Cernauskas, 201 S.W.2d at 1000 (refusing to read literally a statute which purported © to wipe out all statutory law in the state of Arkansas because such a result was an absurdity).

. Michael S. Fried, A Theory of Scrivener's Error, 52 Rutoers L.Rev. 589, 607 (2000); see also Antonin Scarta & Bryan A. Garner, Reapinc Law: THs Interpretation or Lecat Texts 239 (2012) ('The doctrine of absurdity is meant to correct obviously unintended dispositions, not to revise purposeful dispositions that, in light of other provisions of the applicable code, make little if any sense.").